UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:20-cv-80993-WPD

TIMOTHY O'BRYAN

    Plaintiff,

vs.

JOE TAYLOR RESTORATION, INC., a Florida
Corporation, AARON GETTY, individually,
KAREN RADEWICZ, individually, and
GLENDA GALARZA, individually,

    Defendants.
_____/

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendants, JOE TAYLOR RESTORATION, a Florida for profit corporation ("JTR"), AARON GETTY, individually, KAREN RADEWICZ, individually, and GLENDA GALARZA, individually (hereinafter collectively referred to as "Defendants"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 56 and S.D. Fla. L.R. 56.1, hereby file their motion for summary judgment as to Plaintiff's, TIMOTHY O'BRYAN, amended complaint, and as grounds therefor state as follows:[1]

### I.   Introduction

Enacted last year in response to the COVID-19 pandemic, the Families First Coronavirus Response Act ("FFCRA"), Pub. L. No. 116-127, 134 Stat. 178 (2020), contains two (2) provisions

---

[1] Pursuant to S.D. Fla. L.R. 56.1, Defendants concurrently have filed their Statement of Material Facts ("SOF"), as to which Defendants contend there exists no genuine dispute. Throughout this motion, Defendants will cite to the "SOF" along with the corresponding paragraph numbers.

mandating some form of paid leave entitlement for employees impacted by the Coronavirus. First, the Emergency Family and Medical Leave Expansion Act ("EFMLEA"), 134 Stat. at 189–92, temporarily amended Title I of the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), to provide certain employees with *unpaid* leave for an initial ten (10) day period and then up to an additional ten (10) weeks of partially paid expanded family and medical leave where an employee is unable to work due to a "qualifying need related to a public health emergency," which means a bona fide need for leave to care for a child whose school or childcare provider is closed or unavailable for reasons related to COVID-19. *See* 29 U.S.C. §§ 2612(a)(1)(F); 2620(a)(2)(A).

Second, the Emergency Paid Sick Leave Act ("EPSLA"), 134 Stat. at 195–201, provides *all* employees with two (2) weeks paid (or in some cases partially paid) sick leave where the employee is unable to work because the employee is quarantined (pursuant to Federal, State, or local government order or advice of a health care provider), and/or experiencing COVID-19 symptoms ***and*** seeking a medical diagnosis; or because of a bona fide need to care for an individual subject to quarantine (pursuant to Federal, State, or local government order or advice of a health care provider), or care for a child (under 18 years of age) whose school or child care provider is closed or unavailable for reasons related to COVID-19, and/or the employee is experiencing a substantially similar condition as specified by the Secretary of Health and Human Services, in consultation with the Secretaries of the Treasury and Labor. FFCRA, PL 116-127, March 18, 2020, 134 Stat 178 at 195-96. Employers who do not provide paid sick leave as required under the EPSLA are considered to have failed to pay minimum wages in violation of section 6 of the Fair

Labor Standards Act ("FLSA"), 29 U.S.C. § 206, and such employers are subject to enforcement proceedings described in sections 16 and 17 of the FLSA. 29 U.S.C. §§ 216, 217.[2]

Importantly, eligible employers are entitled to receive a credit in the *full amount* of the required sick and family leave, plus related health plan expenses and the employer's share of Medicare tax on the leave, for the period of April 1, 2020, through December 31, 2020.[3] *See* https://www.irs.gov/coronavirus/new-employer-tax-credits. In this way, employers were incentivized to permit the use of the paid sick leave to allow time off to employees impacted by COVID-19, as the required sick leave pay was fully subsidized by the federal government. *New York v. United States Dep't of Labor*, 477 F. Supp. 3d 1, 5 (S.D.N.Y. 2020) ("By granting the employers a corresponding, offsetting tax credit, Congress subsidizes these benefits, though the employers front the costs.").

Plaintiff, Timothy O'Bryan, alleges in his amended complaint he is entitled to two (2) weeks paid sick leave under the EPSLA.[4] His own testimony, however, forecloses his entitlement to same.

## II.     Summary Judgment Standard

Summary judgment "is appropriate only if 'the movant shows that there is no genuine [dispute] as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.

---

[2] The FFCRA also permits retaliation claims related to EPSLA sick leave under the FLSA. *See Kofler v. Sayde Steeves Cleaning Serv., Inc.*, No. 8:20-CV-1460-T-33AEP, 2020 WL 5016902, at *4 (M.D. Fla. Aug. 25, 2020), citing 29 C.F.R. § 826.150(b)(2). Plaintiff abandoned any such claim long ago. *See* ECF Nos. 12 and 13.

[3] The FFCRA sunset on December 31, 2020. 134 Stat. at 198; *see also* https://www.dol.gov/agencies/whd/pandemic/ffcra-questions (last accessed February 10, 2021).

[4] Plaintiff's original complaint erroneously relied upon the incorrect section of the FFCRA; this Court granted Plaintiff leave to amend as a result. *See* ECF No. 18.

R. Civ. P. 56(a), *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*), quoting Fed. R. Civ. P. 56(a);[5] *see also Alabama v. North Carolina*, 560 U.S. 330, 344 (2010). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine [dispute]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). An issue is "genuine" if a reasonable trier of fact, viewing all the record evidence, could rationally find in favor of the non-moving party considering his burden of proof. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014). And a fact is "material" if, "under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). "[W]here the material facts are undisputed and do not support a reasonable inference in favor of the non-movant, summary judgment may properly be granted as a matter of law." *DA Realty Holdings, LLC v. Tenn. Land Consultants*, 631 Fed. Appx. 817, 820 (11th Cir. 2015).

**III.  O'Bryan is not entitled to any paid sick leave under the EPSLA because he did not qualify for it.**

    **a.  Timeline of Events**

        **1.  2018 to April 1, 2020 (Prior to the effective date of the FFCRA)**

Plaintiff, Timothy O'Bryan, began working for Defendant, JTR, in January 2018, as a cleaning technician. SOF, ¶ 1. A cleaning technician's duties are cleaning and tear-down of drywall affected by mold, fire, or water damage. *Id*. When Plaintiff first started working for JTR, his hourly rate was $15.00 per hour; at either the end of 2019, or the beginning of 2020, he received a raise to $16.00 per hour. SOF, ¶ 2.

---

[5]  The 2010 Amendment to Rule 56(a) substituted the phrase "genuine dispute" for the former "'genuine issue' of any material fact."

Plaintiff's work volume increased or decreased *depending on the availability of work*. SOF, ¶ 3. He usually worked 40 hours per week. *Id*. There were times he worked more than 40 hours of work per week. *Id*. If that was the case, he was paid at a time-and-a-half rate. *Id*. And there were also occasions where he would work less than 40 hours per week. *Id.* This occurred in both 2018 and 2019. *Id*. For workweeks in which there was not enough work to justify scheduling Plaintiff for forty (40) hours, and so long as management approved, JTR allowed Plaintiff to use his company-provided benefit of accrued paid time off ("PTO") to supplement his hourly pay, so that he would not suffer a loss in weekly pay, which included Defendant, Glenda Galarza. SOF, ¶¶ 4-5. Plaintiff reported to and was required to take orders from Galarza. SOF, ¶ 5. She was primarily responsible for scheduling workers and approving time off on JTR's behalf, including for Plaintiff. *Id*. Plaintiff could not recall any time JTR (*i.e*., Galarza) denied him the use of accrued PTO. *Id.*

During the week of March 16-20, 2020, JTR properly paid Plaintiff for his work, either through O'Bryan's use of PTO or based on his actual hours worked. SOF, ¶ 6. However, Plaintiff did not work on March 19 or 20, and only worked half of a day on March 18. *Id.* On March 18, Plaintiff texted Galarza he "left [work] shortly after lunch [because he] was starting to get a headache, which usually ends with a migraine." *Id*. At this time, Plaintiff did not believe he had contracted COVID-19. *Id.* Plaintiff returned to work on Monday, March 23, 2020. SOF, ¶ 7. On Tuesday, March 24, 2020 – *less than a week later* -- Plaintiff emailed Defendant, Karen Radewicz, a copy of his doctor's note confirming he suffered from migraines. SOF, ¶ 8. The medical provider who signed the note is Dr. Jack Newcomer, by whom Plaintiff has been treated for at least 25 years. *Id.* The note indicated Plaintiff was under Dr. Newcomer's care for migraines since March 9, 2020. *Id.*

Plaintiff was properly paid from March 19-24, either through O'Bryan's use of PTO (March 19-20) or based on his actual hours worked (March 23-24). SOF, ¶ 9. Plaintiff then was absent from work again on March 25 and 26, 2020, this time due to a stiff back and a previously scheduled doctor's appointment. SOF, ¶ 10. Plaintiff again used accrued PTO on March 25 and March 26, so he did not miss any pay. *Id.* Plaintiff worked regular hours on Friday, March 27, and Monday, March 30, 2020. SOF, ¶ 11. After regular business hours on Monday, March 30, however, Plaintiff claims he began coughing. *Id*. Notwithstanding he did not believe he had COVID-19 at this time, Plaintiff emailed Radewicz after regular business hours on March 30, inquiring about whether and to what extent he (and others) would be paid for any time he (and others) might miss work in the event of COVID-19. SOF, ¶ 12. Plaintiff did not mention anything to Radewicz about experiencing a cough, dizziness, or a chest cold. *Id.* Radewicz immediately responded and advised Plaintiff he (and others) would be able to use accrued PTO or even borrow against future PTO if absences are occasioned by sickness. *Id*.

Approximately twelve hours later, in the early morning hours of Tuesday, March 31, 2020, Plaintiff advised Galarza via text message from his phone: "I called Christian this morning to let him know I wasn't coming in cause I'm not feeling good. Was up coughing and a little dizzy last night no fever though. The coughing started yesterday. Feels like a chest cold." SOF, ¶ 13. Plaintiff did not work on March 31, 2020 or April 1, 2020. SOF, ¶ 14. Plaintiff believed JTR was putting him on a "self-quarantine" for two weeks. SOF, ¶ 18.

### 2. April 1, 2020 to April 15, 2020 (FFCRA goes into effect)

Based on his previous communication and as an obvious precautionary measure, on April 2, 2020, Galarza and Radewicz called Plaintiff to notify him JTR would require him to provide a COVID-19 negative test result before returning to the workplace. SOF, ¶ 15. JTR followed up with

an email to Plaintiff that same day, advising him to "touch base" while he was out, as well as providing him with forms to complete to determine his eligibility for the newly passed COVID-19 related emergency paid sick leave. *Id.* In completing and returning the forms *on the same day* Plaintiff initially indicated on the forms he was "subject to a Federal, State or Local Quarantine or Isolation Order related to COVID-19" as the qualifying event for his eligibility for emergency paid sick leave. SOF, ¶ 16. Upon receipt of his forms, *see* Ex. 5, Radewicz emailed O'Bryan a revised version of one of the forms, making clear in her email Plaintiff "need[ed] a doctor's note that [he is] seeking treatment for COVID-19." SOF, ¶ 17. Further, since he selected the government quarantine option, Radewicz advised Plaintiff that *the Department of Labor* -- not just JTR -- required "the name of the *government entity* that issued the quarantine or isolation order to which [he] was subject." *Id.* She cautioned Plaintiff, "You *may not* receive federal funds for Sick Leave if you do not meet the qualifications set forth by [DOL]." *Id.* Plaintiff cannot reasonably dispute he never provided any applicable government entity's order. *Id.*

Significantly, although obviously an option, Plaintiff did *not* indicate he was "experiencing COVID-19 symptoms and … seeking a medical diagnosis." SOF, ¶ 16. And Plaintiff ultimately admitted during his deposition he was *not* seeking a medical diagnosis for COVID-19 as of this date. SOF, ¶ 18. And while Plaintiff believed JTR was placing him on a "self-quarantine" for two weeks at this point, the undisputable fact remains as of April 2, 2020, Plaintiff was not subject to a federal, state, or local quarantine order. *Id.* Nor was he advised by a healthcare provider to self-quarantine at this time. *Id.*

Four (4) days later – while quarantining -- Plaintiff left a voice mail for Galarza, indicating he felt "100% better" and was ready to return to work. SOF, ¶ 19. **Thus, it is important to note, <u>as of April 6, 2020</u>, Plaintiff cannot reasonably claim he was eligible for emergency paid sick leave**

*under the FFCRA as he had no symptoms, was not seeking a medical diagnosis, and neither was subject to any federal, state, or local quarantine order nor quarantined on advice of a medical provider*. In response, on April 7, 2020, Galarza e-mailed Plaintiff, requesting a doctor's note confirming he is not contagious and releasing him to return to work. SOF, ¶ 20. At this point, Plaintiff backtracked, advising Galarza by email that he spoke to Dr. Newcomer that very day (April 7), who "advised [him] to self-quarantine the two weeks," adding he started "running a fever last night but [had] *no other symptoms*." *Id*.[6] ***Stunningly, by his own admission, Plaintiff never actually spoke to Dr. Newcomer on April 7, 2020***. SOF, ¶ 21. ***Even further, also by his own admission, Dr. Newcomer never directed Plaintiff to self-quarantine***. *Id*.

A little less than a week later, on April 13, 2020, Plaintiff now contradicted his April 7 email that Dr. Newcomer told him to quarantine for two weeks, *see* SOF, ¶ 20, emailing Galarza and stating he "wanted to reach out and let [her] know [he was] feeling fine and ready to come back Wednesday, the 15th," due to his quarantine ending. SOF, ¶ 22. Plaintiff further advised, as of April 13, 2020 he "never got *any* symptoms." *Id*.[7] ***Thus, it is important to note, <u>as of April 13, 2020</u>, Plaintiff cannot possibly claim he was eligible for emergency paid sick leave under the FFCRA as he had no symptoms, was not seeking a medical diagnosis, and neither was subject to any federal, state, or local quarantine order nor directed to quarantine by a medical provider***.

---

[6]   In fact, the following week Plaintiff provided an updated Request for Emergency Paid Sick Leave form, this time indicating (as he claimed in his April 7, 2020 email) that Dr. Newcomer advised him to self-quarantine due to concerns related to COVID. SOF, ¶ 23.

[7]   At best, Plaintiff's April 13, 2020 statement that he "never got any symptoms" is inconsistent with his prior self-reported statements of potential symptoms (cough, fever). At worst, the statement suggests he had not been truthful previously. For purposes of the instant motion, however, the fact is Plaintiff's April 13, 2020 admission confirms he had not met any of the eligibility criteria for emergency sick pay as of April 13, 2020.

Page **8** of **20**

On April 13, 2020, Radewicz emailed Plaintiff, reminding him to fill out and return the updated sick leave form. SOF, ¶ 23. Plaintiff complied on April 14, providing an updated Request for Emergency Paid Sick Leave form, this time indicating (consistent with his subsequently repudiated April 7, 2020 email) that Dr. Newcomer ordered him to self-quarantine due to concerns related to Covid-19. *Id.* Interestingly, as it turns out, Plaintiff did not actually take steps to seek a medical diagnosis from Dr. Newcomer *until* April 14, 2020. SOF, ¶ 24. And at that time, Dr. Newcomer did not observe Plaintiff had any signs or symptoms of COVID-19, including a fever. *Id*. At that visit, Dr. Newcomer testified Plaintiff self-reported he had a "fever" of 100.1 degrees *two weeks prior* (around April 1, 2020). *Id.* Dr. Newcomer's progress note for April 14, 2020 confirms Plaintiff was healthy and ready to return to work as of April 14, 2020 and that he had no symptoms or signs of Covid-19. *Id*. As of April 14, 2020, and again, by Plaintiff's own admission (as well as Dr. Newcomer's own admission and supporting progress notes) Dr. Newcomer ***never*** directed him to self-quarantine. *Id.*

Dr. Newcomer's April 14, 2020 progress note confirmed Plaintiff was healthy and ready to return to work as of that date and that he had no symptoms or signs of COVID-19. SOF, ¶ 24. On April 15, 2020, Plaintiff provided JTR with a note from Dr. Newcomer dated April 14, 2020, stating Plaintiff "had fever 14 days prior," "had been self-quarantined at home," and "As he's evaluated today, he is healthy and ready to return to work." SOF, ¶ 25. Thus, the totality of the evidence suggests, at most, Plaintiff *could have* had a "fever" around March 31/April 1 but did not seek any diagnosis or treatment from Dr. Newcomer until April 14 – two (2) weeks after the fact.[8]

---

[8] The Court may recall O'Bryan previously was able to provide JTR with a proper medical return to work note, confirming his absence was due to migraines, within the same week of suffering same. *See* SOF, ¶ 8.

Because Plaintiff previously had advised JTR of *Dr. Newcomer's* alleged direction to self-quarantine for two weeks -- on April 7, 2020 -- Radewicz emailed Plaintiff on April 15, advising him again JTR needed a doctor's note confirming he was out of work *as of April 7* because of COVID-19. SOF, ¶ 26. Instead, on April 16, 2020, Plaintiff advised JTR he scheduled an appointment for April 17, 2020 to get a COVID-19 test. SOF, ¶ 27.

### 3.    JTR terminates Plaintiff because of his dishonesty.

Finally, on April 20, 2020, Defendants contacted O'Bryan by phone. SOF, ¶ 28. Since he had yet to provide any COVID-19 negative test result and because he was seeking to return from his alleged medical provider directed April 7 quarantine, Defendants contacted O'Bryan to determine if he indeed had followed through with his COVID-19 test, whether he knew the test results, and to otherwise form expectations for both sides as they proceeded. *Id.* During the April 20 call, however, O'Bryan admitted he had been dishonest about Dr. Newcomer directing him to quarantine on April 7 and apologized to Galarza, Getty, and Radewicz for lying to them about it. *Id.* In fact, he never was directed to quarantine by a medical provider. *Id*. In fact, O'Bryan felt poorly about everything that had transpired because he "teaches his sons to be honest and to do the right thing." *Id*. Finally, he mentioned he was already thinking of quitting or not returning to work following his self-quarantine. *Id.* JTR immediately terminated Plaintiff because of Plaintiff's admitted dishonesty. *Id*. Plaintiff understood JTR terminated him because of his dishonesty. *Id.*[9]

---

[9] As reflected by his April 17, 2020 Progress Note, Dr. Newcomer confirms once again he never directed Plaintiff to self-quarantine or isolate. SOF, ¶ 29. Dr. Newcomer also confirms in this note he was not informed of any claimed fever until two weeks after the fact and only in connection with Plaintiff's request for a return-to-work letter two weeks later. *Id*. Even if Plaintiff was truthful about his alleged 100.1 fever on or about April 1, 2020, had he reported it to Dr. Newcomer at the time, Dr. Newcomer would not have considered it a "fever." *Id.* Dr. Newcomer had a "frank discussion" with Plaintiff, in which he told Plaintiff he could not write a return-to-work letter, a "medical-legal document," without any basis for doing so. *Id*. Dr.

Prior to his April 17 test, Plaintiff was aware of the fact he could have paid for a COVID-19 test at a co-worker's doctor's office, but he did not pursue this option because "that was not [his] doctor," and the other doctor was over 30 miles away from his house. SOF, ¶ 30. Nor did Plaintiff pursue a Covid-19 test at any of the free testing sites in Palm Beach County prior to April 17, 2020 because he "couldn't find a place that was testing." *Id.*

  **b.**  **By his own admissions, Plaintiff never qualified for emergency paid sick leave under the EPSLA prior to the time JTR terminated his employment.**

The EPSLA contains six (6) qualifying events for which an employee may qualify for up to two (2) weeks paid sick leave. 134 Stat. at 195–96:

> (1) The employee is subject to a Federal, State, or local quarantine or isolation order related to COVID–19.
>
> (2) The employee has been advised by a health care provider to self-quarantine due to concerns related to COVID–19.
>
> (3) The employee is experiencing symptoms of COVID–19 ***and*** seeking a medical diagnosis.
>
> (4) The employee is caring for an individual who is subject to an order as described in subparagraph (1) or has been advised as described in paragraph (2).
>
> (5) The employee is caring for a son or daughter of such employee if the school or place of care of the son or daughter has been closed, or the childcare provider of such son or daughter is unavailable, due to COVID–19 precautions.
>
> (6) The employee is experiencing any other substantially similar condition specified by the Secretary of Health and Human Services in consultation with the Secretary of the Treasury and the Secretary of Labor.

---

Newcomer's note states Plaintiff admitted his "fever" broke the first day he allegedly had it, concluding, "I will not write letter that I directed his action when in fact I did not" *Id.*

FFCRA, PL 116-127, March 18, 2020, 134 Stat 178 at 195-96. Plaintiff's own admissions dispose of his claim for emergency paid sick leave. Only the first three qualifying reasons bear discussing.[10]

On April 2, 2020, Plaintiff checked off/designated subsection (1) as the reason for his emergency paid sick leave request. *See* SOF, ¶¶ 15-17 and Exhibit 5 attached thereto. But Plaintiff cannot produce any evidence that a "federal, state, or local quarantine or isolation order related to COVID-19" was in effect at any relevant time prior to his termination. SOF, ¶ 17. Moreover, to the extent JTR "quarantined" him and/or he believed that to be the case, *see* SOF ¶ 18, this fact alone does not entitle O'Bryan to the emergency paid sick leave under the Act, as it is not one of the listed qualifying events (JTR certainly is not a federal, state, or local governmental agency).

And because Plaintiff was never directed to quarantine by a medical provider, he does not qualify for EPSLA leave under subsection (2). On April 14, 2020, Plaintiff provided a *separately updated* sick leave form, where he checked off/designated subsection (2) with Dr. Newcomer listed as the treating physician. SOF, ¶ 23. Dr. Newcomer's progress notes for Plaintiff state, in no uncertain terms, Dr. Newcomer had ***not*** directed Plaintiff to quarantine as of April 14, 2020 (or ever):

> S/P Self Quarantine for 2 weeks before notification of office. Work did not accept the written note as stating this office sent him home for two weeks to continually quarantine. ***We did not direct this activity. Recommended he go to Health Dept. if he thinks he has COVID-19***.
>
> …
>
> ***I was not informed of fever until <u>after</u> 2 weeks and request for [return to work] letter was made.***

---

[10] Briefly, Plaintiff has not argued subsections (4) or (6) at any point prior to or during this litigation, and otherwise foreclosed subsection (5). *See* ECF No. 20, p. 3 ("Undoubtedly, there were no allegations in the Complaint regarding childcare.").

> ***I did not direct to be at home and isolating. There is no documentation of the events that took place. This office nor myself not advised until day of visit and day of letter [return to work] request was made.*** He appeared healthy with no signs/symptoms for COVID-19 and he himself said by the time he got home on day #1 his fever "had broken." ***I will not write letter that I directed his action when in fact I did not.***

SOF, ¶ 29 and Ex. 12. Later, on April 20, 2020, Plaintiff *admitted* to Defendants Dr. Newcomer did not order him to quarantine – as of April 7, April 14, *or ever*. SOF, ¶ 28.

Plaintiff's last remaining possibility to qualify for EPSLA paid sick leave, then, is subsection (3), where a person qualifies if they are "experiencing COVID-19 symptoms ***and*** are seeking a medical diagnosis." Plaintiff *never* identified this qualifying event on any of the sick leave forms he completed. *See* SOF, ¶¶ 15, 16, 23 and Exhibits 5-6 attached thereto.[11] Under the plain text of subsection (3), both the "COVID-19 symptoms" and "seeking diagnosis" conditions must be present at the same time. Yet Plaintiff never sought diagnosis or had symptoms at the same time. In fact, Plaintiff reported multiple times to JTR he had *no symptoms at all*. On April 6, Plaintiff admitted he had no symptoms, see SOF ¶ 19, but his boldest proclamation occurred on April 13, when he stated he was "feeling fine" and "***never*** got *any* symptoms." SOF, ¶ 22. Plaintiff, once again by his own admissions, cannot have qualified for paid sick leave under subsection (3) from April 1-15, 2020.

Even if Plaintiff had symptoms (contrary to certain of his representations), he *never* sought a medical diagnosis while allegedly symptomatic. In fact, it was not until April 16, 2020 -- after providing JTR with a doctor's note *raising* more questions than it *answered* -- that Plaintiff for the

---

[11] Even if he did, any paid sick leave would be "limited to time the Employee is unable to work because the Employee is taking *affirmative steps* to obtain a medical diagnosis, such as making, waiting for, or attending an appointment for a test for COVID-19." 29 CFR § 826.20(a)(4)(v). Plaintiff did not actually take steps to seek a medical diagnosis until April 14, 2020. SOF, ¶ 24. And by that time, Plaintiff admits he had no symptoms or signs of COVID-19. *Id.*

very first time took affirmative steps to get tested. SOF ¶ 27. Yet Plaintiff indicated just four days *before* his COVID-19 test he was healthy. SOF, ¶ 22. And on his doctor's visit on April 14, Dr. Newcomer did not observe Plaintiff to have any signs or symptoms of COVID-19, including a fever. SOF, ¶ 24.

    **c.**    **Plaintiff's positive COVID-19 test is a red herring as JTR already had terminated Plaintiff for legitimate business reasons.**

After his termination, on April 24, 2020, Plaintiff called Radewicz and left a voice mail, stating he "just got his results back from the test site," which were positive for COVID-19. SOF, ¶ 31. And while this may have constituted a qualifying event for purposes of Plaintiff's entitlement to emergency paid sick leave as of the date of his test result, JTR already had terminated Plaintiff's employment – for legitimate business reasons Plaintiff does not dispute, *i.e. Plaintiff's dishonesty in connection with his attempts to receive the very same emergency paid sick leave for which he now incredulously sues*.[12] Defendants asked Plaintiff to provide COVID-19 test results as early as April 2, mere hours after Plaintiff first alleged conditions. SOF, ¶ 15. By the time Plaintiff's positive COVID-19 test result came back – and purely because of his own undue delay and dishonesty -- JTR already had terminated Plaintiff's employment. SOF, ¶ 28. Courts have routinely found that dishonesty (even perceived dishonesty) is a legitimate, non-retaliatory reason for terminating an employee. *See Tamba v. Publix Super Markets, Inc.*, 19-14108, 2020 WL 6816964, at *4–5 (11th Cir. Nov. 20, 2020); *Hughes v. City of Bethlehem*, 294 Fed. Appx. 701, 704 (3d Cir. 2008) (employee's dishonesty in taking sick leave for days she was on vacation and then denying her action was legitimate, non-retaliatory reason for discharge); *Smith v. CA, Inc.*, 2008 WL

---

[12]    In fact, any paid sick leave O'Bryan would have been eligible for as of the time he tested positive would have been prospectively applied at that point in time, since O'Bryan would have had to quarantine again for two weeks at that point. But again, JTR already terminated O'Bryan's employment at that point (and O'Bryan certainly does not claim the April 20 termination was retaliatory).

5427776, at *4, *10 (M.D. Fla. Dec. 30, 2008); *Chatman v. Nat'l Railroad Passenger Corp.*, 2008 WL 4164383, at *8, 10 (M.D. Fla. Sept. 5, 2008); *Hataway v. Pias, Inc.*, 2006 WL 517651, at *5 (N.D. Fla. March 2, 2006) (dishonesty and lack of candor in violation of company policy were legitimate, non-retaliatory reasons for *immediately* terminating employee); *see also Jones v. Continental Airlines, Inc.*, 2005 WL 2233619, *4 (S.D. Tex. Sept. 14, 2005) (employee's perceived dishonesty to be a legitimate reason to terminate employee's employment).

### d. Conclusion

As stated at the outset of the motion, the FFCRA's two emergency pay provisions, the EPSLA and the EFMLEA, essentially are federal subsidies for worker's pay during the pandemic. *New York v. United States Dep't of Labor*, 477 F. Supp. 3d 1, 5 (S.D.N.Y. 2020) ("Congress ultimately foots the bill for these [EFMLEA] benefits, by way of a tax credit to the employer or self-employed individual.") and 6 ("As it does under the EFMLEA, the federal government ultimately covers the cost of the [EPSLA] benefits through a tax credit to employers."). But any misappropriation of those monies could be construed as a fraud on the government. *See, e.g., United States v. Bellamy*, Case No. 20-MJ-06428 (S.D. Fla. September 9, 2020) (criminal complaint alleging bank and wire fraud for obtaining loans fraudulently under Paycheck Protection Program, another federally backed COVID-19 program); *see also WP Co. LLC v. U.S. Small Bus. Admin.*, CV 20-1240 (JEB), 2020 WL 6504534, at *15 (D.D.C. Nov. 5, 2020) ("As of mid-September 2020, the Department of Justice had publicly charged more than 50 people with fraudulently obtaining PPP loans."). So there certainly was no incentive on JTR's part to withhold the emergency paid sick leave from O'Bryan or any other employee, so long as a qualifying event occurred (and the employee was not lying!).

The relevant (and undisputed) material facts in this case simply do not warrant the proper circumstances for purposes of providing federal subsidized funds. Up to and through the date of termination, O'Bryan never met the qualifying factor(s) for the receipt of emergency paid sick leave under the EPSLA because he did not (and could not) establish any qualifying event making him eligible. The only potential time he might have qualified for emergency paid sick leave occurred after he was terminated, at which point he was not eligible for *any* additional pay from Defendants. Summary judgment must be granted to Defendants.

**IV.    Even if O'Bryan can demonstrate a temporally relevant qualifying event, he still is not entitled to emergency paid sick leave because he cannot demonstrate the qualifying event was the *but-for* cause of his inability to work; JTR had no work available for O'Bryan in any event.**

The FFCRA rules, *see* 29 CFR § 826.20, *et seq.*, contain language limiting employee entitlement to FFCRA emergency paid sick leave only when the qualifying event is a *but-for* cause of the employee's inability to work. *Paid Leave Under the Families First Coronavirus Response Act*, 85 FR 57677-01 (citing 85 FR 19329). A but-for test "directs [the Court] to change one thing at a time and see if the outcome changes. If it does, [the Court has] found a but-for cause." *Bostock v. Clayton County, Georgia*, 140 S. Ct. 1731, 1739 (2020). Indeed, "[t]his ancient and simple "but for" common law causation test…supplies the "default" or "background" rule against which Congress is normally presumed to have legislated when creating its own new causes of action," which includes federal remedial statutes, like anti-discrimination laws, *see Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1014 (2020) and anti-retaliation laws, *see Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013); *see also Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1343 (11th Cir. 2000) (FLSA retaliation cases use "but-for" causation standard). "Because of," "based on," and "results from," all indicate Congressional intent to use a "but-for" standard. *See Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 63–64, and n. 14, 127 S.

Ct. 2201, 167 L.Ed.2d 1045 (2007) ("because of" and "based on" indicates a but-for standard); *Burrage v. United States*, 571 U.S. 204, 213 (2014) (citing *Safeco Ins.* to support "results from" imposing a "but-for" standard).

In other words, the FFCRA-qualifying event must be the *actual* reason the employee is unable to work, as opposed to a situation in which the employee would not have been able to work *regardless of* any FFCRA-qualifying reason. 85 FR 57677-01. In *New York*, 477 F. Supp. 3d at 10-14, the court invalidated the FFCRA's original rule, in pertinent part here because the but-for standard was not uniformly applied to each qualifying event. When it amended the rule, the Department of Labor applied its earlier but-for standard to all six qualifying events, stating, "[T]he traditional meaning of "because" and "due to" as requiring but-for causation is the best interpretation of the FFCRA leave provisions in this context." 85 FR 57677-01. The Department further explained, "[I]f there is no work for an individual to perform due to circumstances other than a qualifying reason for leave…that qualifying reason could not be a but-for cause of the employee's inability to work. Instead, the individual would have no work from which to take leave." *Id*.

The amended rule contains the following sentences imposing a work-availability requirement on FFCRA emergency paid sick leave in the case of all three qualifying events relevant here:

- "An Employee Subject to a Quarantine or Isolation Order may not take Paid Sick Leave where the Employer does not have work for the Employee as a result of the order or other circumstances." 29 CFR § 826.20(a)(2).

- "An Employee who is advised to self-quarantine by a health care provider may not take Paid Sick Leave where the Employer does not have work for the Employee." 29 CFR §

826.20(a)(3)(ii).

- "An Employee seeking medical diagnosis for COVID-19 may not take Paid Sick Leave where the Employer does not have work for the Employee." 29 CFR § 826.20(a)(4)(v).

Applying the "traditional meanings" of but-for causation language, under the amended rule, Plaintiff thus bears the burden to prove *because* JTR had available work, it owes him the requested emergency paid sick leave *based on* his COVID-19 situation. In this case, JTR did not have enough work for all its cleaning technicians throughout the month of April. JTR employs several techs at any given time and schedules workers based on the needs of the company and on what jobs are scheduled. SOF, ¶ 32. Indeed, the work volume at JTR fluctuated; Plaintiff admitted he worked less than 40 hours per week at times in both 2018 and 2019 due to unavailability of work, SOF, ¶ 3, and that was *before* the pandemic hit in 2020. In April 2020, JTR had 31 jobs available for technicians, which is approximately 25% less jobs than were available in April 2019 (43). SOF, ¶ 32. In fact, April 2020 had the lowest number of available jobs than any other following month in 2020 (31 as compared to an average of 41 jobs from May-December 2020). *Id.*

Upon receipt of an acceptable doctor's note, Plaintiff would have been allowed to return to work after his initial quarantine was over. *Id*. But that did not mean JTR had sufficient work for him; it did not. *Id.* Since other techs already were working and scheduled on current project, and available for work, Plaintiff was not at the top of the list to receive work. *Id*. He would have had to wait his turn for assignments, just as he would have if he were not coming off a quarantine. *Id*.

In sum, this case shows why the DOL's but-for standard works in this case. This Court could change Plaintiff's COVID-19 status to either positive or negative and it would not change the fact JTR had 25% less jobs available in April 2020 for which to schedule its technicians. As a

result, Plaintiff cannot demonstrate he would have been scheduled after April 15 as JTR simply did not have enough available work. Plaintiff's claim therefore is foreclosed in any event as he cannot demonstrate any qualifying factor that was the "but for" cause of his inability to work, as opposed to JTR's unavailability of work. Plaintiff's claim for emergency paid sick leave under the EPSLA fails for this alternative reason.

## V.     Conclusion

Plaintiff attempted to take advantage of the EPSLA, a federal act which he apparently viewed as an opportunity for paid sick leave over and above that which JTR provided voluntarily to its employees. To qualify for the statutory emergency paid sick leave, Plaintiff had to demonstrate a qualifying event. He could not. He was never subject to a governmental quarantine order (contrary to his initial claim). He never was directed to quarantine by a medical provider (contrary to his later claim). And he never sought a medical diagnosis for COVID-19 at a time when he had any particular symptoms. When Defendants asked him for a doctor's note confirming his doctor directed him to self-quarantine as of April 7, he instead admitted his dishonesty, as a result of which he was terminated. Moreover, even if he could demonstrate one of the qualifying events, it was not a but-for cause of his inability to work, as Defendants did not have the volume of work they usually had available at that point in time in April, as a direct result of the pandemic. Plaintiff's emergency paid sick leave claim is without merit and for these reasons, this Court should grant summary judgment to Defendants.

| | |
|---|---|
| Dated: February 17, 2021<br>Boca Raton, FL | Respectfully submitted,<br><br>**Daniel R. Levine**<br>DANIEL R. LEVINE, ESQ.<br>Florida Bar No. 0057861<br>E-mail:   DRL@PBL-Law.com<br>ALEX B.C. ERSHOCK, ESQ.<br>Florida Bar No. 100220<br>E-mail:   ABE@PBL-Law.com<br>PADULA BENNARDO LEVINE, LLP<br>3837 NW Boca Raton Blvd., Suite 200<br>Boca Raton, FL   33431<br>Telephone:     (561) 544-8900<br>Attorneys for Defendants |