# EXHIBIT "A"

# Alicia Kendrick

| | |
|---|---|
| **From:** | Daniel R. Levine |
| **Sent:** | Friday, May 22, 2020 12:17 PM |
| **To:** | david@levylevylaw.com |
| **Cc:** | Chad Levy; Alicia Kendrick; Marissa Gart |
| **Subject:** | Joe Taylor Restoration / Timothy O'Bryan |

David –

As you know, we are labor and employment counsel to Joe Taylor Restoration ("JTR").

I have had an opportunity to look into your allegations, including a review of comprehensive and detailed notes, emails and other record communications my client kept regarding its dialogue with your client, Mr. O'Bryan, during the relevant period of time. As I suggested to you previously, Mr. O'Bryan has not been honest with you in terms of all the relevant details surrounding his departure. This is not surprising, as it was his dishonesty that led JTR to terminate his employment in the first place.

While we could summarily dismiss your allegations with conclusory statements and self-serving denials, I do not want to do that with you, out of respect. To that end, throughout this email, I will provide you with comprehensive details, along with certain evidentiary support, so that you can discuss everything with your client and take a hard look at how this matter is likely to play out in court and whether you really wish to press forward. This is simply one of those cases, and certainly this client, where I will be in the unenviable position of having to pursue sanctions against you for pursuing a frivolous claim. Hopefully, by sharing with you the following information, we will prevail upon you to walk away from this case (and this client).

Mr. O'Bryan was on the schedule and worked on Monday – Wednesday, the week of March 16, 2020.

However, on or about Wednesday, March 18, 2020, Mr. O'Bryan sent the following electronic communication from his phone to his supervisor, Glenda Galarza:

> Hi Glenda, sorry I didn't see you before I left. I left shortly after lunch cause i was starting to get a headache which usually ends with a migraine. I got home and took my migraine medication I'm good now. See you tomorrow.

Around this same date, JTR sent a couple of employees home because they were around someone who showed symptoms of COVID-19. For this same reason, and as JTR was being ultra-cautious with regard to the COVID-19 pandemic at this point back in March, JTR asked Mr. O'Bryan to provide a doctor's note relating to his headache symptoms before returning to work, as JTR wanted to make sure Mr. O'Bryan was not positive for Coronavirus inasmuch as headaches are a symptom. Mr. O'Bryan therefore was taken off the schedule as of March 19.

On or about March 23, 2020 (the following Monday), Mr. O'Bryan provided JTR with the following return to work doctor's note, related to his headache symptoms.



The note seemed a bit curious, as it indicated Mr. O'Bryan was under Dr. Newcomer's care since March 9, 2020. However, since it did not indicate anything relating to COVID-19, JTR allowed Mr. O'Bryan to return to work at this time. Additionally, Mr. O'Bryan was permitted to use his PTO from March 19 – March 24, so he did not miss any pay.

***You may wish to make a mental note of the significance of this particular doctor's note as it will become relevant to the story later on.***

On Wednesday, March 25, Mr. O'Bryan did not report to work, this time due to an alleged "stiff back". Ms. Galarza emailed him:

> I hope all is well. This morning I was notified by the PTL you did not come to work today due to a "stiff back". I was not notified by you directly, so I am reaching out to confirm this was the case and to check on you. Can you please provide us with a description of you symptoms/pain/etc. and what might have cause this. Did you contact your doctor?
>
> I have copied HR and Aaron on this email to keep them in the loop. Thank you.

Mr. O'Bryan responded via electronic communication from his phone approximately fifteen (15) minutes later:

> I did call my doctor that did my surgery and explained the problem and he said if I have been just laying around not doing anything that would cause it. He told me some stretches to do 1st thing when I wake up and walking will help.

Ms. Galarza then responded:

2

> I received your email, thanks for the quick reply. Since you already had a doctor's appointment scheduled for tomorrow and had asked to leave early, please take tomorrow off and lets touch base after your appointment to make sure all is well. Thank you.

Mr. O'Bryan replied:

> Ok, thanks. Also sorry I didn't inform you sooner about not coming in today. I contacted Chris at 6am this morning and i know you said not to contact you that early so i was gonna contact you later.

Mr. O'Bryan continued to use his PTO for March 25 and 26, so he did not miss any pay.

Mr. O'Bryan worked on Friday, March 27 and the following Monday, March 30.

However, after work, in the evening, on Monday, March 30, 2020, Mr. O'Bryan sent the following email to JTR's Director of Operations, Karen Radewicz (who also serves as HR):

**PTO**

  

Timothy O'Bryan
To  Karen Radewicz
Mon 3/30/2020

Hi Karen, hope all is well with you. I just had a question and this is a question that a lot of techs are wondering about, last week and the next week I wa to stay home cause you all thought I was sick and you did'nt want to take the chance of me having the virus. The question is since I was told to stay hon why should i have to use up my vacation pay if i want to get a check? I didn't call in sick or just didn't show up i was told i can't come in. I only have 32 left for the year, there were 4 days I was told not to come in, March 19th, 20th, 23rd, 24th. The other days I took. There are a lot of techs that won't ca sick cause they know you'll make them self quarantine and they said they can't afford to be out of work without pay or use up there vacation pay. I ratl not give names but it is happening. Is there anything that can be done about this? Thank you for your attention on this matter.

Ms. Radewicz promptly responded:

**Re: PTO**

  

Karen Radewicz
To  Timothy O'Bryan
Mon 3/30/2020

Good evening Tim,

I hope you're doing well. Thank you for reaching out, I appreciate all the questions, and voicing your concern.

The first thought is if you know anyone that's not feeling well but still working, to tell them not to report to work. We have health standards to follow only as a company but through Federal requirements. It's very important they follow this to keep everyone safe and well, and for our customers.

Right now Aaron has instructed employees to take PTO or borrow from 2021 so they aren't without a paycheck, if they are out sick.

With all that said, I know this is a difficult time for everyone, it's stressful and unnerving. The best advice I can give tonight is to please ask the people y know who aren't feeling well to stay home. And to ask them to speak with Glenda, or myself, so we can help. We are all in this together.

I'll get back to you with more tomorrow, until then please don't hesitate to reach back out if you need anything or have other concerns or questions.

Take care and stay healthy,
Karen

Best Regards,
Karen Radewicz
404-788-7002

As I am sure you know and can appreciate, the FFCRA was not effective until April 1, 2020.

In any event, on or about Tuesday, March 31, Mr. O'Bryan advised Ms. Galarza via electronic communication from his phone:

> I called Christian this morning to let him know I wasn't coming in cause I'm not feeling good. **Was up <u>coughing</u> and a little dizzy last night no fever though. The coughing started yesterday. Feels like a chest cold**."

On Wednesday, April 1, 2020, Mr. O'Bryan advised Ms. Galarza and Ms. Radewicz he wished to stay home. Ms. Galarza advised him by email at that time:

> Thank you for taking our call today. I'm glad to hear you are not coughing as much anymore and no fever! Please touch base with me every morning to keep me posted on how you are feeling. Attached you will find 2 forms to be completed and returned to me or HR if needed. Please confirm the attachments were received. Let us know if you need anything and get better soon! Thank you."

The two (2) attachments were (1) a Certification of Employee for Eligibility for COVID Related Paid Leave and (2) an Employee Request for Emergency Paid Sick Leave.

On April 2, Mr. O'Bryan signed and returned both forms. At this point, the Company started tracking the days associated with Mr. O'Bryan's self-quarantine, so as to know when the recommended 14 day period was up.

Mr. O'Bryan's supervisor and Ms. Radewicz manager followed up with Mr. O'Bryan at that point, via telephone, and asked Mr. O'Bryan to provide JTR with any COVID-19 test results.

Mr. O'Bryan used his PTO for March 31 through April 3, 2020, while the Company attempted to confirm his eligibility for COVID related paid leave, pursuant to the FFCRA.

On Monday, April 6, 2020, Mr. O'Bryan left a voicemail for Ms. Galarza, informing her he was "100% better" and ready to come back to work.

However, as this was inconsistent with Mr. O'Bryan's previous reports, and because the company certainly did not want a potentially infected employee in the workplace, on or about Tuesday, April 7, 2020, Ms. Galarza followed up with an email:

> I hope you are feeling better. I received your voicemail yesterday. Please contact your Dr. to provide you with a note that says you are not contagious and you are released back to work or a negative test result. Thank you so much.

Mr. O'Bryan responded on Tuesday, April 7:

> Hi Glenda, I spoke to my doctor and **he advised me to self-quarantine the 2 weeks**. **I started running a <u>fever</u> last night but no other symptoms**. I'll keep you updated on how I'm doing. Talk to you soon.

The next day, April 8, 2020, Ms. Galarza followed up yet again:

> Thank you for the update. Please take care of yourself and check in everyday so I know how you are doing. Thanks!

On Monday, April 13, 2020, Mr. O'Bryan advised:

4

> Hi Glenda, just wanted to reach out and let you know I'm feeling fine and ready to come back Wednesday the 15th. My 2 weeks ends after tomorrow. Never got any symptoms. Hope to be on the schedule for Wednesday. Thank you.

Mr. O'Bryan's representation at this time that he "never got any symptoms" was inconsistent with his prior communications, to the effect that he started coughing as of March 30 and had a fever as recently as April 7. Moreover, on April 7, Mr. O'Bryan reported that his doctor advised him to self-quarantine for 2 weeks, which would have been until April 21.

On April 14, 2020, Mr. O'Bryan called and spoke to Ms. Radewicz, advising that he had a doctor's appointment. Ms. Radewicz asked him to get a doctor's note to determine if JTR should continue to quarantine him or alternatively confirming that he is negative/not contagious and able to return back to work. At this time, Mr. O'Bryan also completed and provided an updated Employee Request for Emergency Paid Sick Leave:



**Employee Request for Emergency Paid Sick Leave**

To request emergency paid sick leave as provided under the Families First Coronavirus Response Act and Joe Taylor Restoration's Emergency Paid Sick Leave Policy, please complete this form and submit to your manager or the human resources department as soon as possible before leave commences.

Check the reason below for this emergency paid sick leave request. ***REQUIRED*** – Provide statement explaining why you cannot work or telework due to the reason checked below:
_____

❑ 1) I am subject to a federal, state, or local quarantine or isolation order related to COVID–19. Provide the name of the government entity that issued the quarantine/isolation: _____

X❑ 2) I have been advised by a health care provider to self-quarantine due to concerns related to COVID–19. Provide the name of the doctor who recommended quarantine: _____Dr. Jack Newcomer_____

❑ 3) I am experiencing symptoms of COVID–19 and seeking a medical diagnosis. Provide the name of the medical facility where medical diagnosis was performed:
_____

❑ 4) I am caring for an individual who is subject to either number 1 or 2 above. Provide the name of the government entity or medical provider that issued or recommended quarantine or isolation:_____

❑ 5) I am caring for my child whose primary or secondary school or place of care has been closed, or my childcare provider is unavailable due to COVID–19 precautions. Provide the following information:

Name of child(ren) and age(s): _____

Name of school, place of care OR childcare provider that closed:
_____

Provide a statement explaining that no other suitable person is available to care for the child(ren) during the period of requested leave: _____

❑ 6) I am experiencing another substantially similar condition specified by the secretary of health and human services.

I have attached documentation supporting my need for leave.

Employee Signature ____Timothy S. O'Bryan_____ Date __April 7 2020__

Manager Signature _____ Date _____

HR Department Rep. Signature _____ Date _____

You will note Mr. O'Bryan confirms he was allegedly advised by Dr. Newcomer to self-quarantine for COVID-19 symptoms as of April 7, 2020.

On April 15, 2020, Ms. Radewicz emailed Mr. O'Bryan and requested that Mr. O'Bryan provide a doctor's note attesting to the fact that he was advised to self-quarantine since April 7.

In response, Mr. O'Bryan initially sent only a partial picture of a doctor's note, which raised suspicions, so Ms. Radewicz sent the following email to Mr. O'Bryan:





Thereafter, Mr. O'Bryan sent the following photo to JTR:



So now, despite advising JTR on April 7 that his doctor advised him, on April 7, to self-quarantine for 14 days, Mr. O'Bryan provided JTR with a "doctor's note" stating he has been under the care of Dr. Newcomer for the treatment of an unspecified medical illness **_since April 14_** (the same date of the note itself), proclaiming Mr. O'Bryan may return to work as of April 15. The note also states Mr. O'Bryan had a fever 14 days prior, but we have the email from Mr. O'Bryan himself, dated April 7, where he advised he started running a fever the night before (April 6).

Additionally, I would invite you to compare this note with the one Mr. O'Bryan previously submitted in connection with his alleged headaches/migraines, which I will copy here for your convenience:

7



Both notes are from the same medical office and same doctor. The form appears to be the same. Other than that, I will allow you to draw your own conclusions. But, David, I cannot imagine you would disagree, at the very least, the April 14 note seems extremely suspect. First of all, the handwriting on the April 14 note appears juvenile. But okay, perhaps a different employee filled out the April 14 form and the employee had messy handwriting. It is a possibility. But then we have the fact that, according to the April 14 note, the doctor only saw Mr. O'Bryan once, on April 14, for this unspecified "medical illness", did not test him for COVID-19, yet still proclaimed him ready to return to work on April 15? And do you really think a doctor would – *in writing,* proclaim someone "non-contagious", without testing, based on a one day observation and the patient's self-reporting of his symptoms and the relevant timeline? Extremely doubtful. And then you have the fact that the doctor's signature on the April 14 note, at best, is quite "different than the one on the previous note. The March 23 note seems like a stamped signature, but stamped or otherwise, I assume that is what the doctor's signature typically looks like. The March 23 signature also includes "MD PA" while the April 14 note only includes "MD". That's odd. And the entire style of the signature is quite different. The March 23 signature is fairly skinny and small. The April 14 signature is much larger. If I can see this with my naked eye, I am certain a forensic examiner would have a field day.

Notwithstanding, the saga continued.

On or about Wednesday, April 15, 2020, Ms. Radewicz contacted Mr. O'Bryan by phone and notified him of the need for further documentation (negative test result or doctor's note specifically stating he is not contagious for COVID-19. Mr. O'Bryan advised Ms. Radewicz he would "call his doctor and see what they can come up with".

On or about Thursday, April 16, 2020, Mr. O'Bryan sent the following email:

8



Re: Note from doctor

Timothy O'Bryan
To: Glenda Galarza; Karen Radewicz

Saved to HR | COVID 19



Reply | Reply All | →
Thu 4

Hi Glenda & Karen,  I have an appointment to get tested tomorrow at 10am.  When I get the results I'll let you know. Will that change my st getting paid the sick pay?

Sent via the Samsung Galaxy S10e, an AT&T 5G Evolution capable smartphone
Get Outlook for Android

On or about Friday, April 17, 2020, Mr. O'Bryan confirmed he took the COVID-19 test and is awaiting the results.  On this same date, Ms. Radewicz sent an email to Ms. Galarza, regarding the status of Mr. O'Bryan's return to work, confirming JTR was waiting for further documentation from Mr. O'Bryan.

Finally, on the ensuing Monday, April 20, 2020, Ms. Galarza, Ms. Radewicz and the Company's Vice-President, Aaron Getty, called Mr. O'Bryan to see how he was feeling and if he had received the test results yet.  During this conversation, which took place over speakerphone, Mr. O'Bryan **admitted he had not been honest** about the doctor and quarantining.  As a result, JTR advised Mr. O'Bryan it would have to involuntarily terminate Mr. O'Bryan's employment as he had not been honest with the company.  However, JTR agreed it would not challenge Mr. O'Bryan's claim for unemployment compensation benefits.  JTR also gave Mr. O'Bryan the option of voluntarily resigning, but in that case, by law, he would not be eligible for unemployment.  Mr. O'Bryan chose involuntarily termination.  All three witnesses will attest to this conversation, including the fac that Mr. O'Bryan specifically mentioned he "felt bad" about the entire situation as he always teaches his kids to be honest.

I trust you will review all of this with your client.  Again, should you choose to proceed with this, I feel obligated to put you on notice of the fact JTR will insist we serve a Rule 11 (or 57.105) motion and seek to recover any and all expenses, including reasonable attorneys' fees, incurred in having to defend this case.  I hope you will take this to heart and really do your due diligence here.  You know I do not raise the specter of sanctions as a matter or routine practice.  And when I do, I make sure to provide enough facts and evidentiary support to demonstrate a particular case is truly frivolous.

If you determine to file suit, we will accept service and waive formal service of process.

Be well.

**Daniel R. Levine, Esquire**
***Board Certified in Labor & Employment Law – The Florida Bar***
***Arbitrator & Mediator - American Arbitration Association***



3837 NW Boca Raton Blvd., Suite 200 | Boca Raton, FL  33431
Main: 561.544.8900 | Facsimile: 561.544.8999
**\*\*For the latest legal news and topics, sign up for the** PBL BLOG **\*\***
DRL@PBL-Law.com  |  www.PBL-Law.com

This email is intended solely for the use of the individual to whom it is addressed and may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law.  If the reader of this email is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone and return the original message to us at the listed email address.  Thank You.